Joseph V. MANNING as President of the American Airlines Chapter, Flight Engineers' International Association, AFL-CIO, and American Airlines Chapter, Flight Engineers' International Association, AFL-CIO, an unincorporated association, Plaintiffs,

v.

AMERICAN AIRLINES, INC.,
Defendant.

United States District Court
S. D. New York.

Sept. 9, 1963.

O'Donnell & Schwartz, New York City, for plaintiffs; Asher W. Schwartz, Wal-ter N. Kaufman, New York City, of counsel.

Arthur M. Wisehart, New York City, for defendant; George A. Spater, New York City, of counsel.

WYATT, District Judge.

This motion by plaintiffs for a preliminary injunction raises questions under the Railway Labor Act (45 U.S.C. § 151 and following; the "Act"), made applicable to air carriers by amendments effective April 10, 1936 (45 U.S.C. § 181). The facts are perfectly clear and beyond dispute; the questions are only of law.

The action is for an injunction and a declaratory judgment. Plaintiffs are President Manning of American Airlines Chapter, Flight Engineers' International Association, AFL–CIO (the "Chapter") and the Chapter itself. Defendant (often called "American" or "the Company" herein) is a very large and important common carrier by air.

The Chapter has been for a number of years, and is now, the collective bargaining respresentative of the employees of American in the "craft or class" of flight engineers. In opposing the present motion, American contended that the status of the Chapter as representative was in doubt. This contention was also made in another action in this Court, but an opinion and decision in such other action (Ruby, etc. v. American Airlines, Inc. et al., 63 Civ. 585), filed August 12, 1963, rejected the contention and for present purposes it is no longer available to defendant.

An agreement, usually called the "basic agreement", was made between American and its flight engineers, represented by the Chapter, effective May 1, 1958. The duration provision of this basic agreement was in relevant part as follows:

"This Agreement shall become effective May 1, 1958 and shall continue in full force and effect until April 30, 1963 and shall renew itself without change until each successive April 30 thereafter unless written

notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to April 30 in any year after April 30, 1962; * * *."

There was a separate agreement between the parties, usually called the "dues check-off agreement", also effective May 1, 1958. This agreement provided for deduction of dues and payment thereof to the Chapter, as permitted by Section 2, Eleventh, (b), of the Act (45 U.S.C. § 152, Eleventh, (b)). The duration provision of the dues check-off agreement was as follows:

"G. This Agreement shall become effective May 1, 1958 and shall continue in full force and effect until April 30, 1963, and shall be subject to renewal thereafter only by mutual agreement of the parties hereto."

There was another separate agreement between the parties under which a system "board of adjustment" was established as required by the Act (45 U.S.C. § 184). The duration provision of this adjustment board agreement was word for word the same as the part quoted above from the duration provision of the basic agreement.

It will be noted that the dues check-off agreement, unlike the two others, was not to "renew itself" but was to be in effect only "until April 30, 1963" and was "subject to renewal thereafter only by mutual agreement of the parties hereto".

Under date of February 28, 1963, notices of intended changes in the *basic* agreement were given by the Chapter and by American under Section 6 of the Act (45 U.S.C. § 156).

Under date of March 8, 1963, the Chapter gave a similar notice (often called a "Section 6 opener") to the Company with respect to the *dues check-off* agreement. The change proposed was in paragraph G, to make the duration of the dues check-off agreement the same as that of the basic agreement.

The Company took the position that this Section 6 opener as to the dues check-off agreement was not timely served and moreover that the restrictions in Section 6 against altering "rates of pay, rules, or working conditions" had no application to dues check-off because of the expiry date of the agreement.

The Company therefore took the further position that it would discontinue dues check-off after the expiry of the agreement on April 30, 1963, and presumably it has done so.

This action was then commenced.

The motion asks that the Company be enjoined preliminarily from discontinuing the dues check-off.

The theory of the action, and of the motion, is that the March 8, 1963 notice or "opener" under Section 6 made applicable the procedures provided by the Act for the settlement of a dispute by collective bargaining, that until these procedures have been followed to exhaustion there is a statutory duty on the parties to maintain the status quo, and that discontinuance of the dues check-off by American is an alteration of the status quo and thus a violation of the Act.

The purpose of the Act is broadly to avoid strikes or other interruptions of commerce by requiring collective bargaining, by encouraging arbitration and use of the services of the National Mediation Board ("NMB") and by forbidding during this process any alteration "by the carrier" of "rates of pay, rules, or working conditions".

A detailed description of the Act's procedures was made by Judge Bryan in American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 783–785 (S.D. N.Y.1958).

The provision of Section 6 requiring maintenance of the status quo by the carrier is in relevant part as follows (45 U.S.C. § 156):

"In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the

Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

■ Normally the grant of a preliminary injunction, an extraordinary remedy as it is generally called, must be based on a "clear showing of probable success and possible irreparable injury to plaintiff" (Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. St., 299 F.2d 33, 35, 2d Cir., 1962).

In this instance, there being no real dispute about the facts, very little (if any) more could be developed at the trial than is now before the Court. The arguments for the parties have been directed therefore primarily to the merits, as a matter of law, and the decision now to be made—although on a motion for a preliminary injunction—is of the ultimate merits of the action rather than (more narrowly) on the probability of success of plaintiffs.

The theory for plaintiffs, as outlined above, taken together with the quoted provision in Section 6 of the Act, makes out prima facie a case for relief.

### 1.

The principal points for defendant should therefore be examined now.

### a.

Defendant says that an interpretation of an agreement is required; that this is for the adjustment board under the agreement between the parties, the Act, and relevant decisions; and that failure of the Chapter to submit the matter to adjustment board procedures is fatal to this motion and to the action.

The "adjustment board" provided for by Section 204 of the Act (45 U.S.C. § 184) is designed to settle disputes "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions".

The agreement between these parties establishing an adjustment board was made in compliance with Section 204 and the board was given jurisdiction to decide disputes "which may arise under the terms of the Flight Engineers Agreement". The "Flight Engineers Agreement", from its definition and otherwise, seems clearly to be the basic agreement; the dues check-off agreement is not included nor even referred to.

In any event, neither "grievances" nor the "interpretation or application" of any agreement are involved here. The duration provision of the dues check-off agreement needs no interpretation because it is clear on its face. It expired on April 30, 1963. Plaintiffs do not claim that the agreement has been extended, either by the Section 6 notice or otherwise. They admit that the agreement has expired by its terms.

The Larsen case (Larsen v. American Airlines, Inc., 2 Cir., 313 F.2d 599) cited for defendant involved a claim by an individual employee that he had been discharged in violation of a collective bargaining agreement; the rights there asserted by plaintiff were founded on the collective bargaining agreement. The Larsen decision is in no way applicable here, where the claim by the Chapter is not based on any violation of the agreement or on any "interpretation or application" of the agreement but rather on a claimed violation of the Act itself.

■ For substantially the same reason, International Ass'n. of Machinists, A.F.L.-C.I.O. v. Northwest Airlines, Inc., 304 F.2d 206 (8th Cir., 1962), cited by defendant, is clearly distinguishable. The Court there found that the issue was one of contract interpretation, that the dispute was therefore "minor", and that the adjustment board had exclusive juris-

diction. The Court explained (304 F.2d at 209):

"As pointed out in Elgin, Joliet & Eastern R. Co. v. Burley, 325 U.S. 711, 722–28, 65 S.Ct. 1282, 89 L.Ed. 1886, substantial differences in procedures exist in the handling of major and minor disputes. Major disputes are to be settled only by processes of non-compulsory adjustment through mediation and conciliation. Major disputes result when there is disagreement in the bargaining process for a new contract, while a minor dispute arises over the interpretation of an existing collective bargaining agreement in a particular fact situation.

"We agree with the trial court that the dispute here presented is a minor dispute. The contract interpretation issue presented is whether the Boiler Operators upon demand of their employers that they perform their duties are obligated under their existing contract to cross the picket line established by the Flight Engineers."

In the case at bar, to repeat, there is no question of contract interpretation. The contract has expired, the Chapter wishes to negotiate a new one and the dispute arises over whether there is to be a new contract or not. This is a "major" dispute in which the Court may properly grant an injunction on the requisite showing. Virginian Railway Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

b.

Defendant argues that an injunction to maintain the status quo is forbidden by the Norris-LaGuardia Act (29 U.S.C. § 101 and following), specifically by Section 8 thereof (29 U.S.C. § 108) because plaintiffs have not made "every reasonable effort" to settle the dispute by calling on NMB or by conferring with the representative of American's pilots.

So far as NMB is concerned, the time would not appear to be ripe or right for invoking its services. There have not been any conferences between the parties to settle the "dispute" over extension or renewal of the dues check-off agreement, this not due to any fault of the Chapter but because of the position taken by defendant itself.

The duty of the parties to confer and the propriety *thereafter* of invoking the services of NMB is spelled out by Judge Bryan in American Airlines, Inc. v. Air Line Pilots Ass'n, cited above, as follows (169 F.Supp. at 784; emphasis supplied):

"If either carrier or employees desire to make any change in the status quo with respect to conditions of employment, either under an existing collective bargaining agreement or in its absence, they must give 'at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions'. § 6.

"Thereafter it is the duty of both parties under the mandate of Section 2 to confer and the Act directs that the time and place for the beginning of conference '*shall* be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice'. (Emphasis supplied.) § 6.

"*If the conferences fail* either party may invoke the services of the Mediation Board which 'shall promptly put itself in communication with the parties' and 'shall use its best efforts, by mediation, to bring them to agreement'."

In such a dispute as here exists, appeal to NMB is the *second* step not the first. This feature of the Act was discussed, for example, in a recent decision (Railroad Yardmasters of America v. St. Louis, S. F. & T. Ry. Co., 218 F.Supp. 193, N.D.Texas 1963) where the Court reviewed the controlling Supreme Court decisions and concluded (218 F.Supp. at 200–201; emphasis supplied):

"They say that the Act seeks to induce agreement by requiring good faith negotiations as the *first* step in

resolving each type of dispute. 45 U.S.C.A. Sec. 152. After that, the procedure is different for each class. Where the parties fail to accomplish a settlement of a major dispute in the *initial* negotiations, they must exhaust administrative machinery for mediation, arbitration (if acceptable to both), and adjustment of the controversy. 45 U.S.C.A. Secs. 152, 155–159."

So far as conferring with representatives of the pilots is concerned, there appears to be nothing whatever to indicate that this would be either reasonable, or at this time appropriate. The dispute is between the Company and the flight engineers solely and the issue is whether the dues check-off agreement between them shall be extended or renewed. With this issue, the pilots have no concern.

There is no showing that "every reasonable effort" has not been made by plaintiffs as contemplated by Section 8 of the Norris-LaGuardia Act (29 U.S.C. § 108) and that Act does not prevent relief to plaintiffs to which they may be entitled under the Railway Labor Act.

### c.

■ Defendant claims that a Section 6 opener under the dues check-off agreement was governed by the 60 day provision of the basic agreement and that service on March 8, 1963 (or on March 15, 1963 when defendants states the notice was received) was not timely. The short answer to this is that the two agreements were separate and distinct, the 60 day provision of the basic agreement neither by its terms nor otherwise was applicable, the dues check-off agreement contained no provision as to service of Section 6 notices, and the wording of Section 6 itself was applicable, namely, that "at least thirty days' written notice" must be given. The notice served by the Chapter was therefore timely.

### 2.

■ It seems to come down to this, that without entering into any discussions, the defendant on expiry of the check-off agreement and with notice of the union's desire to have such discussions, the defendant on expiry of the agreement "altered" one of the "rules" or "working conditions", namely, the dues check-off. This seems plainly in violation of Section 6 of the Act (45 U.S.C. § 156), whether defendant believed it could properly do so or not.

So clear a violation of the Act requires relief to plaintiffs by way of injunction.

■ Defendant says that such an injunction would limit "the freedom of employees" and be contrary to Section 2 Eleventh (b) of the Act recognizing dues check-off agreements. The argument is not persuasive nor is it in any way supported by Felter v. Southern Pacific Co., 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854, (1959) cited for it. The employees (who are not themselves complaining) can revoke the assignments already given by them, as provided therein and in the Act. To enjoin discontinuance of the dues check-off cannot possibly affect such employees, whose complete freedom of revocation of assignments continues undisturbed.

Defendant further says that to require continuance of the dues check-off would in effect extend the old agreement, or make a new agreement for the parties— this because the old agreement definitely expired on April 30, 1963, and all obligations of defendant under it to check-off dues then expired also.

The analysis for defendant is not, however, the proper one. An injunction here is to enforce the duty of defendant under the *Act*, not under the old agreement or any agreement now being imposed by the Court.

Congress has forbidden a change by defendant of "rates of pay, rules, or working conditions" during the processes required by the Act. Congress believed that labor peace in the air carrier industry would be promoted by maintaining the status quo while efforts were being made to reach agreement. In this instance, if defendant were now free to use the self-help of stopping the dues check-

off, the union would seem equally free to strike over the issue. Congress meant a negotiating, cooling and mediating period to intervene before such confrontations.

It is not required that defendant reach or make any agreement to continue the dues check-off. It is required that defendant bargain in good faith on the subject with the union, and until the processes contemplated by the Act are concluded, the defendant must continue the check-off. If the processes under the Act are followed to completion and no agreement results, defendant will then be free to stop the check-off—but not before.

■ The Company argues that by limiting the check-off of dues to a fixed period expiring April 30, 1963, the parties agreed that no notices under Section 6 of the Act could be served so as to impose an obligation on the Company to continue dues check-off past April 30, 1963, as part of the maintenance of the status quo required by Section 6. This argument of the Company is in substance that the dues check-off agreement provided that the procedures of Section 6 of the Act would not apply.

The agreement itself contains no such provision specifically and nothing which specifically denies to either party the procedures of Section 6. True, the duration provision of the dues check-off agreement differs from the others, but this seems merely to mean that the dues check-off agreement would not "renew itself without change" but on the contrary any extension had to be the subject of negotiations and could only come about by "mutual agreement". There is nothing in this to indicate that the parties were agreeing that negotiations for an extension were to be in disregard of the provisions of Section 6 of the Act. To find such an unusual and significant agreement express words would be necessary; it cannot be found by implication or from the omission of any reference to Section 6 notices.

■ But even if such were the undertaking of the parties, it could not be given effect because it would be invalid as against the public interest as declared by Congress in the Act. See Felter v. Southern Pacific Co., 359 U.S. 326, 79 S. Ct. 847, 3 L.Ed.2d 854 (1959). A careful reading of Flight Engineers Int'l Ass'n, A.F.L.-C.I.O. v. Am. Airlines, Inc., 303 F.2d 5 (5th Cir., 1962) reveals nothing to the contrary.

In this connection, it must be remembered that Section 2 First of the Act (45 U.S.C. § 152 First) imposes a solemn duty on the carrier and the union "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes * * *". It is contrary to the whole scheme of the Act for either party to any expired agreement to take the position that upon such expiration all obligation disappears. There remain the obligations under the Act to follow its negotiating and other processes and to maintain the status quo until those processes are completed.

■ That irreparable injury will be caused to plaintiffs by discontinuance of the dues check-off during negotiations seems sufficiently clear. Interruption in the established manner of collecting dues will certainly affect adversely the financial position of the union; mere change in the mechanics of collection will make difficult the receipt by the union of its income from dues. It is represented by affidavit that the union has extraordinary expenses in connection with litigation, including the lengthy proceedings in the other action (63 Civ. 585) pending in this Court and to which the union is a party. Defendant argues that damages will compensate the union, but such damages may require time for determination and collection; the need of the union is doubtless for income now. Moreover, if (as found) failure presently to check-off the dues and pay them over to the Chapter is in violation of the Act, such violation should not be permitted to weaken the Chapter in the present period. The balance of convenience as between the parties certainly favors plaintiffs. It is difficult to see what harm can be done

to defendant by continuing, for the necessary period, the check-off of dues. The deductions are made under assignments from the individual employees; it is their money, not defendant's, which is involved.

The motion for a preliminary injunction is granted. The foregoing opinion sets forth the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

Settle order on notice. Suggestions are invited from counsel as to the amount of security to be required of plaintiffs under Fed.R.Civ.P. 65(c).